In re Harris I. KORITZ, Bankrupt.

MIDDLESEX INSURANCE
CO., Plaintiff,

v.

Harris I. KORITZ, Defendant.

Bankruptcy No. 78–1699–HL.

United States Bankruptcy Court,
D. Massachusetts.

July 3, 1979.

## MEMORANDUM ON DISCHARGEABILITY

HAROLD LAVIEN, Bankruptcy Judge.

Plaintiff's amended complaint seeks a determination that a debt due it from the bankrupt is non-dischargeable under Bankruptcy Act Section 17a(4), 11 U.S.C. § 35(a)(4)[1] because of the bankrupt's fraud while acting in a fiduciary capacity towards the plaintiff.

---

[1] Section 17a(4), 11 U.S.C. § 35(a)(4) provides in pertinent part:

"A discharge in bankruptcy shall release a bankrupt from all of his provable debts . . . except such as . . . were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity."

The following facts are relevant to the procedural aspects of the case.

In the notice for first meeting of creditors the Court, in two distinct sentences, fixed November 20, 1978 as the last date for filing complaints for objecting to discharge and to determine dischargeability. On November 8, 1978 the Trustee, in a motion asserting Section 14 grounds, moved to extend the time for filing "Objections to Discharge." The Court granted the motion, extending the time for filing "Objections to Discharge" until December 22, 1978. Although the time for filing objections to discharge was enlarged, no extension was granted for Section 17 complaints to determine non-dischargeability of a particular debt.

On December 20, 1978, the plaintiff, Middlesex Insurance Company, filed a complaint (amended on February 7, 1979 after a pre-trial conference) alleging that the debtor's obligation to the plaintiff resulting from a state court default judgment was created by the debtor's fraudulent failure as a fiduciary to remit insurance premiums, making the debt non-dischargeable under Section 17a(4). The defendant raised four defenses by means of various motions and an answer, all of which were reserved for determination until after trial on the merits:

First, that the complaint was untimely because the extension of time was granted solely for Section 14 objections to discharge, not for Section 17 complaints;

Second, that there was no express or implied fiduciary relationship between the debtor and the creditor;

Third, even if there existed an implied fiduciary obligation imposed by statute, the debtor did not commit the type of fraud or defalcation that should bar discharge of the debt; and

Fourth, an issue raised orally at trial and subsequently by brief, that the plaintiff was not the real party in interest nor a proper plaintiff to this action because it is not a creditor in view of its having received payment of the bankrupt's obligation to it.

After hearings on various motions and a pre-trial conference, an evidentiary hearing was held without a stenographer. From the testimony adduced and exhibits introduced I find the facts as follows:

The Harris I. Koritz Insurance Agency, Inc. was a duly organized Massachusetts corporation which before its demise had been in the insurance brokerage business under appropriate licensing for many years. Its principal stockholder, officer, and manager Harris I. Koritz was also a duly licensed insurance broker. Throughout 1975 Harris I. Koritz Insurance Agency, Inc. conducted its business of insuring automobiles through a general agent. On December 9, 1975, the agency applied to the Massachusetts Motor Vehicle Reinsurance Facility, a state agency charged with assigning insurance carriers to brokers to ensure the availability of sufficient motor vehicle insurance coverage in this compulsory coverage state. The Facility assigned the Harris I. Koritz Insurance Agency, as a "Designated Agent" to the Middlesex Insurance Company. This business relationship, as explained to the court by Mr. Dana I. Jewell, Vice-President and Secretary of the Facility, is characterized by a limited role for the insurance company. All of the insurance business written by the "Designated Agent" is actually written on behalf of the Facility which receives all the premiums and pays for all losses. Companies such as Middlesex are merely granted a fee for handling the clerical work arising from the transactions. There was no written contract between Middlesex and its "Designated Agent" as there would be with its regularly appointed agents.

On December 24, 1975, Middlesex sent the Harris I. Koritz Insurance Agency, Inc. materials necessary for carrying on business as a Designated Agent, with a letter stating in pertinent part:

All policies will be written by the Company for your agency and will be direct billed to your insureds from our office. Your insureds are to remit premiums directly to the Company as indicated on the bill. Commissions will be paid to you when the insureds remit the premium to us.

You have no authority to act for the Company other than to place and service the automobile insurance within the purview of your designation, or as may be conferred by applicable statutes, rules and regulations.

At trial Middlesex conceded that the Harris I. Koritz Agency immediately took exception to this direct billing procedure in a letter which neither party is now able to present. The agency apparently objected on the grounds that under Mass.Gen.Laws Chap. 175 Sec. 162 the insurer could not impose a direct billing procedure without the assent of the agent. Furthermore, the Agency asserted the impossibility of a direct payment procedure by Middlesex since policies had already been sold, bills sent, and premiums collected by the Agency.[2] The Agency also felt that awaiting Middlesex billing would result in possible losses because of undue delay in collecting premiums since Middlesex was not prepared to commence billing until March in view of problems involving rate setting by the State Insurance Commissioner. Apparently this method was accepted by Middlesex for it took no action for at least three months regarding the Agency's rejection of the direct billing-direct payment method. In fact, the exhibits evidencing the first billings in March, 1976 which were not sent until April, 1976 indicate that Middlesex sent the Agency monthly statements and the Agency paid approximately $120,000 back to Middlesex by means of corporate checks. *See Munro v. Bowers*, 293 Mass. 514, 200 N.E. 393 (1936).

The Harris I. Koritz Insurance Agency, Inc. filed a Petition for an Arrangement under Chapter XI on April 14, 1976, and was subsequently adjudicated a bankrupt on June 7, 1976. Harris I. Koritz filed an individual bankruptcy petition on September 11, 1978.

The bankrupt, Harris I. Koritz, was never a broker, agent, or designated agent for Middlesex Insurance Company. No evidence was offered to prove that he appropriated or employed any premiums for his own personal benefit. Middlesex has not shown that any allegedly improperly collected premiums by the Agency were the result of any improper billing by the Agency *after* it received the Middlesex bills in March. All of the evidence offered indicated that the Agency billed its customers before the insurance company bills were received by the Agency. When the Agency received the Middlesex customer bills in March, they were not sent to the customers. Rather, the Agency used the Middlesex bills with its remittances to track their payments.

On September 30, 1977, the Massachusetts Motor Vehicle Facility paid or credited Middlesex with the unpaid balance due from the Koritz agency, $56,706.29, pursuant to a reimbursement agreement which provided as follows:

In consideration of reimbursement by the Facility of $56,706.29 the Company agrees to diligently and promptly pursue all reasonable means of recovery, including the institution of legal proceedings if necessary, of premiums due from the Agency.

■ To deal first with the bankrupt's fourth contention, it is clear that Middlesex was not a creditor[3] of the bankrupt as of the date of the filing of the petition—September 11, 1978. The Massachusetts Motor Vehicle Reinsurance Facility had completely paid the obligation of the Agency to Middlesex. Furthermore, as explained by Mr. Jewell, the Facility was responsible for the payment of losses resulting from coverage; Middlesex merely rendered administrative services for the Facility. Thus, Middlesex cannot be considered the real party

---

2. Although not explained at trial, the records of the Harris I. Koritz Insurance Agency, Inc. reveal that the Agency sold policies and collected premiums in October and November, even before designation to Middlesex.

3. Bankruptcy Act Section 17c(1) and its counterpart Rule 409(a)(1) provide:

The bankrupt or any *creditor* may file an application with the court for the determination of the dischargeability of any debt.

in interest[4] capable of prosecuting this action.

However, since Middlesex would probably be entitled to a reasonable opportunity to substitute the Massachusetts Motor Vehicle Reinsurance Facility, *see Matter of Bradford*, 3 Bankr.Ct.Dec. 246 (S.D. N.Y.1977), had it made the appropriate motion, the other issues presented for determination will be considered in the order raised.

## II.

■ Does the enlargement of time granted for filing Section 14 objections to discharge also serve to extend time for filing Section 17 complaints?

Section 14b(1) sets forth the time limits for filing § 14 and § 17 complaints:

> The court shall make an order fixing a time for the filing of objections to the bankrupt's discharge and a time for the filing of applications pursuant to paragraph (2) of subdivision c of section 17 of this Act to determine the dischargeability of debts, which time or times shall be not less than thirty days nor more than ninety days after the first date set for the first meeting of creditors. Notice of such order shall be given to all parties in interest as provided in section 58b of this Act. The court may, upon its own motion or, for cause shown, upon motion of any party in interest, extend the time or times for filing such objections or applications.

Section 17c(2) supplements the previous provision:

> A creditor who contends that his debt is not discharged under clause (2), (4), or (8) of subdivision a of this section must file an application for a determination of dischargeability within the time fixed by the court pursuant to paragraph (1) of subdivision b of section 14 of this Act and, unless an application is timely filed, the debt shall be discharged.

The Bankruptcy Rules also shed light on this issue. Rule 404(a) and (c) provide:

> (a) *Time for Filing Complaint Objecting to Discharge.* The court shall make an order fixing a time for the filing of a complaint objecting to the bankrupt's discharge under § 14c of the Act. The time shall be not less than 30 days nor more than 90 days after the first date set for the first meeting of creditors, except that if notice of no dividend is given pursuant to Rule 203(b), the court may fix such time as early as the first date set for the first meeting of creditors.
>
> (c) *Extension of Time.* The court may for cause, on its own initiative or on application of any party in interest, extend the time for filing a complaint objecting to discharge.

Similarly, Bankruptcy Rule 409 provides the time requirements regarding a § 17 determination of dischargeability.

> (2) *Time for Filing Complaint Under § 17c(2) of the Act; Notice of Time Fixed.* The court shall make an order fixing a time for the filing of a complaint to determine the dischargeability of any debt pursuant to § 17c(2) of the Act. The time shall be not less than 30 days nor more than 90 days after the first date set for the first meeting of creditors, except that if notice of no dividend is given pursuant to Rule 203(b), the court may fix such time as early as the first date set for the first meeting of creditors. The court shall give creditors at least 30 days' notice of the time so fixed except that only 10 days' notice is required if notice of no dividend is given under Rule 203(b). Such notice shall be given to all creditors in the manner provided in Rule 203. The court may for cause, on its own initiative or on application of any party in interest, extend the time fixed under this paragraph.

---

**4.** Federal Rules of Civil Procedure 17(a) provides:

> Every action shall be prosecuted in the name of the real party in interest . . . No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification or commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Rule 906 provides the general rule for enlargement of time. It is, however, inapplicable in the present case given the more specific provisions controlling discharge in Rule 404(c) and dischargeability in Rule 409(a)(2).

The plaintiff's complaint is entitled Objection to Discharge. However, plaintiff has conceded that it is a complaint seeking a determination of non-dischargeability of a particular debt under Section 17a(4). By order and first meeting notice dated October 4, 1978 the court fixed November 20, 1978 as the last date for filing § 17 complaints. This complaint was filed December 20, 1978. No extension regarding Section 17 complaints was requested or granted; no motion to file a complaint late was filed. The bankrupt has continually objected to the untimely filing in its motion to dismiss, answer, oral argument, and briefs. The Middlesex Insurance Company seeks to justify the filing on the grounds that the court granted the trustee's request to extend time for filing "Objections to Discharge" until December 22, 1978. In this case, no extension was granted for the filing of Section 17a(4) complaints. An extension for filing objections to discharge under Section 14 is neither applicable to nor interchangeable with a Section 17 complaint. They are separate and distinct provisions to which different time rules apply. An extension of one type of action does not necessarily extend the time for filing the other. *Matter of Hubbard*, 577 F.2d 98 (9th Cir. 1978).

This untimely complaint must be dismissed unless some compelling reason mandates the court's exercise of its discretion to extend the time for filing. The majority of courts has adopted the view that the Bankruptcy Judge has discretionary power to extend the time for filing a Section 17 non-dischargeability complaint or a Section 14 objection to discharge past the deadline originally prescribed by the court when the request for enlargement is made within ninety days of the first meeting of creditors because during that time the court retains its inherent power to extend the time for filing complaints regarding dischargeability under § 14b(1). *E. g., In re Jones*, 560 F.2d 775 (7th Cir. 1977); *In re Solomon*, 506 F.2d 463 (7th Cir. 1974); *In re Cassimatis*, 439 F.Supp. 1294 (E.D. Mo. 1977); *In re Magee*, 415 F.Supp. 521 (W.D. Mo.1976); *Keenan v. Builders Appliances, Inc.*, 384 F.Supp. 14 (D. Wis.1974); *Hollandsworth v. Karawha Valley Bank*, 2 Bankr. Ct. Dec. 19 (S.D. Va.1973) (Copenbar, B. J.). *But see In re Hubbard*, 577 F.2d 98 (9th Cir. 1978). While the court may well have discretionary power to extend the time for filing pleadings after the expiration date, it should not be lightly exercised, especially when the result of an extension would run counter to the goals of expeditious administration of the estate and the speedy determination of the status of the bankrupt's obligations as dischargeable or non-dischargeable.[5] The objective of expeditious and economical administration of bankruptcy estates has frequently been recognized as a chief purpose of the bankruptcy laws. *Katchen v. Landy*, 382 U.S. 323, 328, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1966); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47, 22 L.Ed. 636 (1879). The Bank-

---

**5.** Many sections of the present Bankruptcy Act exemplify this purpose. Section 47a(1), 11 U.S.C. § 75 provides:

"Trustees shall (1) collect and reduce to money the property of the estates for which they are trustees, under the direction of the court, and close up the estates as expeditiously as is compatible with the best interests of the parties in interest;"

Section 57d, 11 U.S.C. § 93d, makes certain unliquidated or contingent claims not allowable and hence not provable, thus not affected by the discharge, resulting at times in leaving a creditor without a remedy regardless of the merits or the equities as, for example, in a liquidation bankruptcy of a corporation. ". . . and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this Act."

Congress by the all pervasive grant of jurisdiction to bankruptcy courts under the Bankruptcy Reform Act of 1978, Publ. No. 78–598, 28 U.S.C. § 1471, streamlines administration of bankruptcy cases by avoiding the delay in administration caused by concurrent or exclusive jurisdiction over bankruptcy issues in another court.

ruptcy Rule explicitly emphasizes the importance of the speedy closing of bankruptcy cases.[6]

The courts that have exercised their discretion to allow a late complaint objecting to discharge or dischargeability stress the lack of harm to the bankrupt caused by the late complaint; however, delay always causes some harm and may itself be a denial of due process or at least be contra to the essence of rehabilitation. After bankruptcy, life must go on. The viability and rapidity of that process is the essence of the fresh start doctrine. Yet how can the bankrupt make plans, arrange financing, or attempt to reestablish an economic future until he knows whether his debts—particularly the large ones—are to be discharged or not? The courts have consistently held that exceptions to discharge are to be narrowly construed. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915).

> "One of the primary purposes of the Bankruptcy Act is the rehabilitation of an honest debtor by discharging his debts to afford him a fresh start in his economic life. Exceptions to this general policy should be strictly construed against an objecting creditor and in favor of the debtor's right to discharge."

*Matter of Vickers*, 577 F.2d 683, 686–87 (10th Cir. 1978). A related consideration which should weigh in the decision is that the creditor who was notified of the time limitations had adequate opportunity to file pleadings within the allotted time or to request an extension during that time and failed to do so.

The creditor in the present case has offered no excuse to justify his failure to file a pleading or request an extension for filing Sec. 17 complaints within the appropriate time period. The bankrupt, aware of the extension for only Sec. 14 actions and the limited grounds therefor, namely the production of books and records, and that he was complying and making his peace with the trustee, had no reason to expect that any creditor would attempt to rely on this extension for filing the Sec. 17 complaint. The discharge extension does not apply to dischargeability. The complaint was late and even if a proper motion were made to be allowed to file a complaint late this is not an appropriate case for exercise of discretion. *Matter of Hubbard*, 577 F.2d 98 (9th Cir. 1978). In justifying the exercise of discretion some courts have made reference to the unfairness of the creditor suffering because of his attorney's failings. The creditor in such a case has his remedies but not in this Court. If the law is not to become hopelessly bogged down in delay, time limits must be upheld except in the most egregious cases [7] of which this is not one. Not only has nothing approaching excusable neglect or good cause been offered by the creditor but the merits themselves present no example of gross injustice or a compelling reason for the exercise of the court's discretion based on equity or good conscience.

The plaintiff's complaint was untimely filed.

## III.

The parties having made a full evidentiary presentation and briefed the issues of the

---

**6.** "These rules shall be construed to secure the expeditious and economical administration of every bankrupt estate and the just, speedy, and inexpensive determination of every proceeding in bankruptcy." Bankruptcy Rule 903.

**7.** In my opinion, a major cause of congestion of the courts is the ease with which extensions and continuances are granted and defaults removed. Hon. James Lawrence King has advised newly appointed federal judges:

"Every United States District Judge has a solemn responsibility under our law to render justice in every case as promptly and economically as possible. You heard Judge Will say the same thing. He calls it giving it the highest quality of justice at the least cost in the fastest time. You're going to hear that theme running throughout this seminar. Each and every one of us is going to tell you that same thing . . . Achievement of justice, of course, is rendered absolutely impossible by delay . . . You are going to, or you should, I suggest, unless there's very good cause shown, you're going to deny that motion for continuance."
Seminar for Newly Appointed United States District Judges, Sept. 13–18, 1976, Federal Judicial Center, Washington, D.C., pp. 67 & 71.

existence of a fiduciary duty or its breach, a further analysis may be desirable to be sure no relief is warranted in equity and good conscience.

Bankruptcy Act Section 17a(4), 11 U.S.C. § 35(a)(4) provides that a discharge shall release a bankrupt from all provable debts except such as were "created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity."

Thus, at the outset, for the plaintiff to sustain its burden of proving non-dischargeability under this section, it must establish either one of two elements: that the bankrupts created the debt through fraud, etc., while acting as an officer, *or*, while acting in a fiduciary capacity. *Crawford v. Burke*, 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147 (1904).

█ Plaintiff's complaint does not allege that the obligation was created by Koritz's fraud or defalcation while acting as an officer of the creditor Middlesex Insurance Co. He had no official capacity in Middlesex. He was an officer of his own insurance agency. The debt did not arise from a breach of duty by Koritz as officer of Middlesex. If he owed any duty to Middlesex it was owed in his individual capacity. Thus, Middlesex cannot claim the debt to be non-dischargeable under the officer portion of § 17a(4). *See United States Fidelity & Guaranty Co. v. Tanner*, 279 F.Supp. 396, 400 (D. Colo.1968); *Taitch v. Lavoy*, 57 Wash.2d 857, 360 P.2d 588, 591 (1961) (insurance broker not an officer of carrier so as to render debt non-dischargeable due to fraud while acting as an officer).

The alternative requirement of § 17a(4) is that the "fraud, embezzlement, misappropriation, or defalcation" must have been committed while the bankrupt was acting in a "fiduciary capacity."

There exists a division of authority as to whether an insurance agent is a fiduciary with respect to premiums held for an insurance company within the meaning of § 17a(4). The decisions are split as to whether an insurance broker has such a duty in the absence of a contractual proviso.

Several courts have refused to impose a fiduciary relationship on the broker regarding premiums in the absence of an express trust. *E. g., Palmer v. Hussey*, 119 U.S. 96, 7 S.Ct. 158, 30 L.Ed. 362 (1886); *Matter of Oetzel*, 1 Bankr. Ct. Dec. 1334 (S.D. N.Y. 1975); *Matter of Titus*, 2 Bankr. Ct. Dec. 554 (E.D. Mich.1976); *Emery & Kaufman Ltd. v. Heyl*, 227 La. 616, 80 So.2d 95 (1954); *Taitch v. Lavoy*, 57 Wash.2d 857, 360 P.2d 588 (1961); *Cf. Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (agent not fiduciary).

The above cited cases have uniformly reasoned that the term "fiduciary capacity" relates to an express agreement of trust, and not a trust implied in law. The trust must have existed independent of and prior to the conduct which triggers the operation of a trust *ex maleficio.*

The creditor, Middlesex, cites a line of cases which impose a fiduciary duty upon the insurance broker in possession of premiums by reason of state statutes delineating the duties of a licensed broker. The statutes in these cases explicitly create a technical trust in the insurance premiums from the inception of their collection independent of any subsequent misappropriation. *See, e. g., Matter of Whitlock*, 449 F.Supp. 1383 (W.D. Mo.1978); *In re Clois Herring*, 4 B.C.D. 104, 106–07 (N.D. Ga.1978) and cases cited therein; *Guernsey-Newton Co. v. Napier*, 151 Wash. 318, 275 P. 724 (1929); *Matter of Mountain*, 45 Am.B.R. 414 (1941).

The relevant Massachusetts statute, M.G.L. c. 175 § 176 provides:

An insurance agent or broker who acts in negotiating or reviewing or continuing a policy of insurance . . . issued by a company lawfully doing business in the Commonwealth, and who receives any money or substitutes for money as a premium for such a policy . . . from the insured or holder thereof, shall be deemed to hold such premium in trust for the company. If he fails to pay the same over to the company after written demand made upon him therefor, less his commission and any deductions to which, by written consent of the company, he

may be entitled, such failure shall be prima facie evidence that he has used or applied the said premium for a purpose other than paying the same over to the company . . . .

The Supreme Judicial Court, in *Munro v. Bowers*, 293 Mass. 514, 200 N.E. 393 (1936), an analogous case, has considered this statute in the context of whether it always automatically created a fiduciary relationship. The court held that the provision does not automatically give rise to a trust relationship. Rather, the substance of the transaction must be examined to determine whether the parties contemplated a fiduciary relationship. In fact, the court found that the custom of dealing among the parties which included monthly billings and the lack of a direct relationship created a debtor creditor relationship notwithstanding the statute.

■ In the present case there was no contemplated fiduciary relationship between the individual bankrupt and Middlesex. The corporation was the broker and designated agent, not the individual. The corporation was not a shell created for this purpose but had been in business for several years. The corporation was billed, and payments were made by the corporation. Middlesex was informed from the very beginning that the corporation was engaged in its own billing and collecting and did nothing to alter the payment arrangement which must be considered tacit approval of the procedure. In fact, the insurance company appears to have expressly approved the arrangement once it began to bill the agency.

The evidence presented did not indicate that the bankrupt used any premiums retained for his personal benefit. There is no basis to warrant piercing the corporate veil so as to impose any fiduciary duty on Harris Koritz individually. Despite any effect upon the obligations of the corporate agency, any attempt to have the statute impose a trust on Koritz individually *ex maleficio* does not meet the § 17a(4) standard. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

The decisions cited by Middlesex in support of its assertion of the existence of a trust imposed by statute are readily distinguishable from the instant case. *In the Matter of Whitlock*, 449 F.Supp. 1383 (W.D. Mo.1978), involved an explicit agreement between the individual bankrupt and the insurance company creating an express trust and concomitant fiduciary relationship. Furthermore, the imposition of a fiduciary duty was justified by a finding that the individual had obtained a pecuniary benefit by retention of the funds. *See also Maguire Co. v. Herzog*, 421 F.2d 419 (5th Cir. 1970). The holding of *Morgan v. American Fidelity Fire Insurance Co.*, 210 F.2d 53 (8th Cir. 1954), that premiums collected by the insurance agency were held in trust for the company in derogation of fiduciary capacity was based on an express agreement between the parties that the agent was acting in a fiduciary capacity in *his* transactions with the insurance company. *Id.* at 55. In *Standard Guaranty Insurance Co. v. Herring*, 4 Bankr. Ct. Dec. 104 (N.D. Ga. 1978) only the individual could be licensed by the state as an insurance agent.

In the present case, there was no written agreement or trust between the individual bankrupt and the insurance company. He was not the designated agent nor was there any evidence that he collected premiums individually or that he individually benefited or used them for personal gain. The corporation was duly licensed and was the designated agent. The corporation was not a sham; it was not a recent creation but had an established licensed corporate insurance brokerage business.

Considering these facts and the Congressional intent favoring the fresh start doctrine as illustrated by the 1970 amendment to the Bankruptcy Act giving the Bankruptcy Court exclusive jurisdiction over these types of dischargeability complaints and the Supreme Court's insistence on an express trust and not one implied in law or created *ex delicto*. This bankrupt was neither an officer nor a fiduciary in the context of Sec. 17a(4).

## IV.

 Although there is no finding of a fiduciary duty it should be noted that all claims against fiduciaries are not non-dischargeable. Section 17a(4) expresses its concern for limiting non-dischargeability even in the case of a fiduciary to the dishonest debtor. It is not every breach of duty but only those involving serious misconduct that come under the headings of "fraud, embezzlement, misappropriation, and defalcation." Dishonesty is implicit in the very meaning of fraud or embezzlement. "Misappropriation" eludes exact definition. No less eminent an authority than Judge Learned Hand has called misappropriation a "baffling word, at best, in this context." He suggests that it may have been added to avoid some traditional limitations to the word "embezzlement." Cowans, *Bankruptcy Law and Practice*, 2nd ed. p. 388.

But what is encompassed in "defalcation"? It does not impart absolute liability for nonpayment as suggested by M.G.L. ch. 175 sec. 176. Judge Hand suggests a requirement of less misconduct than misappropriation but nonetheless some knowing misconduct. *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir. 1937).

 I do not find any knowing misconduct sufficient for fraud, embezzlement, misappropriation or defalcation within the context of Sec. 17a(4).

Considering all of the evidence and what appears to this Court to be the more compelling view of the law in light of the repeatedly stated policy considerations of Congress and the courts, namely, expeditious resolution of rights and duties as they arise in the bankruptcy context and providing the honest debtor with a fresh start, judgment is to enter for the bankrupt. The Middlesex Insurance Co. has been paid and is not a creditor and therefore has no standing to bring a complaint under Sec. 17c and Rule 409(a)(1). To allow it an opportunity to amend by adding the Massachusetts Motor Vehicle Reinsurance Facility, even if it could do so, would serve no purpose since the complaint was filed late, and to the extent that a late filing might be allowed as a matter of discretion the Court declines to exercise such discretion. The Court having heard the evidence notes that the plaintiff failed to sustain its burden of proving its debt non-dischargeable under Sec. 17a(4).

To the extent that Middlesex has a judgment or execution against the bankrupt from the District Court of Central Middlesex, the plaintiff Middlesex is ordered to return the judgment or execution to the Court endorsed satisfied or discharged by virtue of these bankruptcy proceedings. Said judgment and any execution issued thereupon are null and void under both Section 14f(1) and this order.